**In re BOB NICHOLAS ENTERPRISE, INC., Debtor.**

**W. Steve Smith, Trustee Plaintiff,**

**v.**

**Nicholas/Earth Printing, L.L.C.; et al., Defendants.**

**Bankruptcy No. 03–39036–H5–7.
Adversary No. 04–3892.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Jan. 10, 2007.

Justin D. Burrow, Kenneth R. Breitbeil, McFall, Sherwood & Breitbeil PC, Houston, TX, for plaintiff.

D. Ross Martin, Erin T. Fontana, Rope & Gray LLP, Boston, MA, Douglas H. Edwards, Haynes & Boone LLP, Houston, TX, for defendants.

Richard L. Fuqua, II, Fuqua & Keim, Houston, TX, for Debtors.

## *MEMORANDUM OPINION*

KAREN K. BROWN, Chief Judge.

Before the Court is the Third Amended Complaint filed by Steve Smith, Trustee, seeking damages and avoidance of transfers under 11 U.S.C. §§ 544, 548, 549 and 550. After trial on the merits, the Court concludes that the trustee has failed to prove any cause of action and consequently is not entitled to any relief.

### I. Facts

Bob Nicholas Enterprise, Inc. dba BNE Fine Printing was formed in 1999, began business in 2000, and was located at 3558 East T.C. Jester Blvd. Houston, TX 77018–6023. Marvin E. ("Bob") Nicholas was chairman and 45% shareholder, his wife, Arita C. Nicholas was President and 55% shareholder.

BNE was a printing company capable of printing sheet-fed short-run to medium-run commercial print work on its three presses, a Man Roland 706LV, fully auto-mated, computerized 6 color, 40–inch wide sheet fed press, with coating capabilities, valued at $2.3 million, a Heidelberg 72ZP, 2 color press with a maximum sheet capacity of 20 X 28, and a Ryobi 3302, 2–color press with a maximum sheet capacity of 13 X 19, suitable for stationary and business cards. Another company, Sharp Imaging, Inc., operated its high technology pre-press equipment valued at about $2 million at the same location and performed all of BNE's pre-press work of converting photographs, artwork, and typed copy into digital images, separating digital color images into process colors, and assembling films and burning film images onto printing plates using photochemical processes.

In connection with BNE's acquisition of the Man Roland printing press, Bob Nicholas executed a non-competition agreement dated June 3, 1999, in which he agrees that he will not, "in Harris County or Fort Bend County, Texas, during the term of this agreement ... (a) engage in any aspect of the printing business as engaged in by the Company or the sole proprietorship heretofore doing business as Innerfaith Printing Company ... (e) request or advise any present or future customer or supplier of the Company to withdraw, curtail or cancel its business with the Company; ... The term of this Agreement commences on the date hereof and shall end 24 months after Covenantor's termination as an officer or employee of the Company."

As BNE did not have any web presses, its capability to take on big jobs was severely limited. Jobs requiring web printing were sent to R.R. Donnelley. Although BNE hoped to receive sheet-fed print referrals from R.R. Donnelley in exchange, it never did. In addition to outsourcing its pre-press work and web-print jobs, BNE outsourced its bindery work. Because its prices were too high on outsourced work and it did not have the struc-

ture, capacity or finances to handle a large account, BNE lost bids repeatedly with at least one potential client. There is no evidence that BNE ever made a profit from outsourced work. In fact, there is no evidence that BNE ever turned a profit on any of its work. While a single 6–color sheet fed printer can produce $10–12 million in sales annually, BNE's earnings were only $1½ million in 2001, $1 million in 2002, and less than $300,000 in 2003. BNE went from a startup company in 2000, garnering industry acclaim for the quality of its print work, to a defunct corporation with no employees, no presses, and no office, by April 2003.[1]

Arita and Bob Nicholas started BNE because they had learned that major corporations devote a percentage of their budgets to minority-owned vendors and that minority-owned businesses are under-represented in the printing industry. Bob Nicholas was a news anchor on television for 35 years, with 23 of those years in Houston for the NBC Houston affiliate, and was well recognized in the Houston broadcast area. Bob Nicholas retired from broadcasting so that the Nicholases could access his retirement fund to invest in BNE. Arita and Bob Nicholas are African American and obtained certification for BNE as a minority-owned business enterprise with the Houston Minority Business Council. Verifying the legitimacy of minority ownership is a matter of careful scrutiny by certifying entities and the application process requires accurate documentation and on-site visits.

By early May 2003, BNE's lack of ability to perform print work prevented it from submitting quotes for print jobs to Shell Oil, BNE's major client. Despite the company's lack of printing presses, its financial inability to buy ink or paper, or to pay other companies, including Sharp Imaging, Inc., for work it might outsource, Arita and Bob Nicholas continued unflaggingly to promote the business, marketing and networking on BNE's behalf in attempts to resuscitate it, including an effort as late as June 10, 2003, when Arita submitted an application for minority supplier status listing the Nicholases' home address for that of the company.

Attempting to remedy their dire financial position, Bob Nicholas contacted several companies about starting a business of which the Nicholases would own 51% so that the business could apply for certification as a minority owned business. One company with which Bob Nicholas spoke was Packaging Impressions which operates in Dallas. BNE had done business with Packaging Impressions and Bob Nicholas had begun talking with Jim Guelker at Packaging Impressions about a joint venture in March 2003. As of the beginning of May 2003, the Nicholases thought they would pursue a joint venture with Packaging Impressions and would move to Dallas.

During this time, Bob Nicholas received an inquiry from Weyerhauser about a print job. He referred the inquiry to James Litteken, one of BNE's former salesmen, whom he knew had found a job at Earth Color Houston ("ECH"). Litteken had left BNE in April 2003, because he and the other employees were not getting paid on time, the company was not producing work internally, and Bob and Arita Nicholas had held a conference with all of

**1.** On January 15, 2003 Man Roland sent a letter demanding turnover of BNE's primary printing press. BNE ceased using the press on February 14, 2003. Man Capital repossessed the press on April 25, 2003. BNE's other presses were subject to a security interest in favor of JPMorgan Chase and were repossessed and sold in mid-April, 2003. According to its statement of affairs, BNE vacated its premises in April 2003.

the employees and told them that the business was closing. Litteken got the job at ECH through some of his friends who had been hired by ECH after another local printing company, Haywood Graphics, had closed down. ECH performed that print job and five others in May and June 2003. ECH lost money on two of the jobs because Litteken agreed to Weyerhauser's request to perform the jobs for the price BNE used to charge.

After he was hired, Litteken told his sales manager at ECH about his former employers, Bob and Arita Nicholas. The Nicholases met with the sales manager at ECH. Earth Color then flew Arita and Bob Nicholas from Houston to Newark on May 7, 2003.

On May 19, 2003, Earth Color and the Nicholases held a conference call to discuss formation of a certified minority-owned business in which the Nicholases would be full time employees and Earth Color would provide the necessary start up funds which would be repaid at a low interest rate. The Nicholases would be paid a salary plus quarterly bonus of a percentage of gross sales and would use the bonus to paydown the debt.

The principals of Earth Color, Dennis Ganzak its chief financial officer, and Robert Kashan, its chief executive officer, anticipated that the new company would perform mostly sheet-fed work and required the new company to lease from Earth Color, at a market rate, a Heidelberg press otherwise standing unused in New Jersey. Under the deal, Earth Color would perform the pre-press and finish work and Earth Color would get the first bid on outsourced work. On inquiry by Earth Color, the Nicholases, having forgotten the one from 1999, told Earth Color there were no non-competition agreements. Earth Color was not interested in doing the deal to take advantage of the Nicholas'

client base, as many of those same clients had been customers of Earth Color for years, but rather, Earth Color wanted to maximize use of its existing presses and work force to perform work that would be available once the new company was certified as minority-owned.

At some point, a private equity firm involved in the strategic and financial analysis of the proposed joint venture, the Monitor Clipper Group, which owns about 40% of Earth Color, prepared a document with input from Kashan and Ganzak, for presentation to bankers connected with Earth Color's credit agreements in order to obtain permission for Earth Color to invest in the proposed joint venture. The Monitor Clipper Group was successful in obtaining this permission.

On June 10, 2003, Earth Color's accountants reviewed the proposal's tax consequences to Earth Color and considered alternative ways to structure the transfer of the press to the new business to minimize, for Earth Color, the federal and state tax consequences and reviewed ways to structure receipt of the operating lease payments. On June 11, 2003, Earth Color's attorneys expressed concern about Bob Nicholas' debt and Earth Color's potential liability if the new business were structured as a limited partnership. Earth Color's counsel and accountants determined that altering the new company's structure from a limited partnership to a limited liability corporation did not change the tax impact to Earth Color significantly.

On July 16, 2003, the Nicholases executed documentation forming a joint venture with Earth Color known as Nicholas/Earth Printing LLC, structured to take advantage of the Nicholases' ability to obtain certification for the business as a minority-owned enterprise. Nicholas/Earth Printing, LLC does business at 7021 Portwest Dr., Ste. 100, Houston, Tx 77024–8084 in

the same location as ECH. Under the joint venture, printing jobs outsourced by Nicholas/Earth to Earth Color are subject to a pricing analysis by Earth Color and Earth Color has the right to refuse the work.

Nicholas/Earth did not meet Earth Color's expectations for sheet-fed work. Nicholas/Earth lost $400,000 in 2003, and $200,000 in 2004, until Sprint became a customer. Now Sprint and Verizon, clients referred by Earth Color, constitute 92% of Nicholas/Earth's work. Sprint and Verizon's work is mainly web-work which required the purchase of two new web presses at a cost of over $6 million financed at 10%. Nicholas/Earth repaid Earth Color's start up loan of $600–$900,000 by the beginning of 2006.

Bob Nicholas Enterprise, Inc. filed a chapter 7 voluntary petition on June 26, 2003. Attorneys fees for the corporations bankruptcy lawyer were paid by Earth Color. Bob Nicholas filed an individual chapter 7 voluntary petition on June 24, 2004. The trustee for BNE's bankruptcy estate filed this adversary proceeding on November 8, 2004.

## II. Causes of Action

The trustee alleges that Bob Nicholas Enterprise, Inc. transferred its corporate assets to Nicholas Earth, Earth Color and the other defendants with actual intent to hinder, delay or defraud its creditors or for less than reasonably equivalent value, while it was insolvent or when it was engaged in business for which its remaining property was unreasonable small capital, in violation of Tex. Bus. & Comm.Code § 24.001, et seq. (Uniform Fraudulent Transfer Act) and 11 U.S.C. § 548. According to the trustee's third amended complaint, briefs, and pre-trial motions and responses, those corporate assets include BNE's customer accounts, customer lists, contracts, customer prospects, accounts receivable, goodwill, commercial printing purchase orders, commercial printing jobs, confidential and proprietary information, BNE's identity, and special knowledge of BNE's client's unique needs and preferences including pricing. Under the trustee's theory, but for the fraudulent transfer of BNE's assets to the defendants, the trustee could have liquidated those assets and paid BNE's creditors. The trustee seeks avoidance of these transfers and damages from the transferees including the profits from existing and prospective customers of BNE or that Bob Nicholas solicited during his first 24 months at Nicholas/Earth in violation of the BNE noncompetition agreement. To the extent that any of the alleged transfers occurred post-petition, the trustee seeks to set them aside as unauthorized post-petition transactions.[2] Further, the trustee seeks recovery against the transferees under 11 U.S.C. § 550.[3]

---

**2.** § 549. Postpetition transactions

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.
11 U.S.C. § 549.

**3.** § 550. Liability of transferee of avoided transfer

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550.

Tex. Bus. & Comm.Code § 24.005 provides:

(a) A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; ...

Tex. Bus. & Comm.Code § 24.005.

Tex. Bus. & Comm.Code § 24.006(a) provides:

A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time ...

Tex. Bus. & Comm.Code § 24.006(a).

" 'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Comm.Code § 24.004(d). " 'Asset' means property of a debtor." Tex. Bus. & Comm.Code § 24.002(2). " 'Property' means anything that may be the subject of ownership." Tex. Bus. & Comm.Code § 24.002(10). " 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset ..." Tex. Bus. & Comm.Code § 24.002(12). "[A] transfer is not made until the debtor has acquired rights in the asset transferred." Tex. Bus. & Comm.Code § 24.007(4).

Bankruptcy Code § 548 provides:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property ... made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ... indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made ...

11 U.S.C. § 548.

### a. Purchase Orders

█ The trustee contends that Bob Nicholas wrongfully transferred six BNE purchase orders to the defendants. The trustee contends that the transfer occurred when Nicholas replied to Weyerhauser that BNE could not perform the work and suggested that Weyerhauser contact BNE's former employee, James Litteken, at ECH. The trustee contends that even if BNE could not fill the orders itself, it could have outsourced the work to another company. In short, the trustee contends that BNE should have done exactly what it did do, sent the work to someone else.

█ The Court finds that the trustee has failed to prove the elements of a fraudulent transfer of the prospective work. A property interest consists of more than a unilateral expectation or abstract need,

there must be a legitimate claim of entitlement. *National Collegiate Athletic Assn v. Yeo*, 171 S.W.3d 863 (Tex.2005). The trustee has not shown that BNE had contracts with its customers to perform the work in question. The trustee has not shown or even alleged that defendants tortiously interfered with BNE's relationships with its prospective or existing customers. BNE's customers were free to accept or reject Nicholas' suggestion that BNE's former employee might be able to perform the work.

■ Further, BNE did not have the financial ability or personnel to perform the work on either an in-house or outsourcing basis. "The business opportunity arises where a corporation has a legitimate interest or expectancy in and the financial resources to take advantage of a particular business opportunity. A corporation's financial inability to take advantage of a corporate opportunity is one of the defenses which may be asserted in a suit involving an alleged appropriation of a corporate opportunity." *Landon v. S & H Marketing Group, Inc.*, 82 S.W.3d 666, 681 (Tex. App.—Eastland 2002). The trustee has failed to prove that BNE had the financial ability to perform the jobs or to outsource them at a profit. Outsourcing the six jobs would at the very least have required BNE to pay an employee to price the job, locate other companies to perform each component of the work, pay the other companies for their work, oversee delivery of the work to the customer, and prepare and deliver to the customer a BNE invoice at a time when BNE had no employees and had vacated its office. In addition, BNE might have been required to buy the paper to provide to the printer of the outsourced job.

The Court finds that BNE did not have a property interest in prospective work for Weyerhauser or for any other customer.

The Court finds that the purchase orders in question originated at Earth Color and were not transferred by BNE.

**b. Good Will**

■ The trustee complains that the defendants are the transferees of BNE's goodwill. The trustee further contends that the doctrine of quasi-estoppel bars Nicholas/Earth from claiming that BNE had no goodwill upon filing bankruptcy.

■ The trustee urges that quasi-estoppel arises from an application for certification as a Historically Underutilized Business submitted by Nicholas/Earth to the State of Texas which claimed Nicholas/Earth had $950,000 in goodwill at its inception. "The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Bott v. J.F. Shea Co., Inc.*, 299 F.3d 508 (5th Cir.2002).

The evidence shows that the Nicholases believed they personally possessed valuable goodwill. Moreover, the evidence shows that their belief that their personal intangible contribution to the joint venture had value, while not cognizable under generally accepted accounting principles, was not unjustified. The couple believed that Bob Nicholas' name and face recognition and numerous personal contacts resulting from decades on television as a news anchor, their research into the underutilized minority-owned printing business sector, and their relentless marketing approach had intrinsic value. BNE, while taking full advantage of the couple's personal characteristics, could not overcome its limited finances, lack of printing capacity, and non-competitive pricing structure. Com-

bining the couple's personal characteristics with a national company with existing presses, workforce, and access to sufficient financial resources, however, has resulted in a profitable company. BNE was never profitable and closed for business at the end of April 2003.

The Court finds that Nicholas/Earth's application claiming the existence of good-will for itself is not inconsistent with an assertion that BNE had no good will. Nicholas/Earth's claim of good will in no way disadvantaged BNE.

■ The Court finds that the trustee has failed to prove that BNE had any good will. "Good-will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." *Rice v. Angell,* 73 Tex. 350, 11 S.W. 338 (1889).

■ The question of whether good will does or does not exist is one of fact. *Airflow Houston, Inc. v. Theriot,* 849 S.W.2d 928, 933 (Tex.App.—Hous. (1 Dist.) 1993); *Taormina v. Culicchia,* 355 S.W.2d 569 (Tex.Civ.App.—El Paso 1962, writ refused n.r.e.).("The question of whether good will does or does not exist is one of fact for the jury to decide."); *Sanderfur v. Beard,* 249 S.W. 274, 276–277 (Tex.Civ.App.—San Antonio 1923) ("The charge of the court did not submit to the jury any issue to find as to whether there existed any good will that passed by the sale, whereas the court assumed on this issuable fact, strenuously contested, as to whether there was any, to hold there was, and thereby instructed the jury to determine its value. Appellants had a right to have the jury pass on that issue.")

■ Texas law provides that goodwill does not exist apart from a reasonably profitable business. *Sanderfur v. Beard,* 249 S.W. 274, 276–277 (Tex.Civ.App.—San Antonio 1923) ("A profitable business may exist unsupported by good will, but good will cannot exist as far as value is concerned unconnected with a reasonably profitable business."); *Taormina v. Culicchia,* 355 S.W.2d 569 (Tex.Civ.App.—El Paso 1962, writ refused n.r.e.) ("The value of the 'good will' of a business depends upon the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business.")

■ Once the business ceases to operate, good will is extinguished. *Nail v. Nail,* 486 S.W.2d 761, 763 (Tex.1972) ("It is generally held that good will has no existence as property in and of itself, as a separate and distinct entity, but only as an incident of a continuing business having locality or name. The rule has been otherwise stated that as good will must adhere to some principal property or right, the extinction of such right operates to extinguish the good will dependent on it."); *Ellman v. Reinarz,* 390 S.W.2d 519, 521 (Tex.Civ.App.—Austin 1965, writ dismissed) ("The asset of 'good will,' ... would be greatly impaired, if not lost, by appellants' inability 'to finance and otherwise carry out and perform their said obligations in connection with' the newspaper business ..."); *Green v. Bennett,* 110 S.W. 108 (Tex.Civ.App.1908, writ dismissed)("Once in liquidation what appellants term the 'good will' of the bank, no matter how valuable before the dissolution, becomes a negligible quantity. The act of

liquidation destroys the value of such good will, as a value separate and apart from the value of the tangible assets.")

■ If cessation of operations is wrongfully caused, the destruction of good will is compensable. *Scott v. Doggett,* 226 S.W.2d 183 (Tex.Civ.App.—Amarillo 1949, writ refused n.r.e.) (Grocery business whose customers did not return after grocer re-stocked goods taken by wrongful attachment and which consequently was forced to close was entitled to recover for destruction of its goodwill.)

■ The trustee failed to prove that BNE was profitable. The trustee failed to prove that BNE had goodwill. The trustee failed to prove that BNE's cessation of business was wrongfully caused. The trustee failed to prove that any good will was transferred to defendants.[4] The trustee asserts that BNE had $3.1 million in good will based on the opinion of his expert, Terry Musika. Mr. Musika's testimony shows, however, that he did not value BNE's good will. Instead, Musika calculated the value of the prospective gross earnings of the hypothetical joint venture described in the Monitor Clipper document based on the numbers contained in the hypothetical financial projections contained in that document. Further, although Musika opined that filing bankruptcy does not exhaust good will because a company could restructure in a reorganization, enter into a joint venture, or enter into a brokering arrangement, the trustee of BNE did not seek to operate BNE, reorganize BNE, sell BNE, enter into a joint venture with another company, or enter into a brokering arrangement for BNE.

The Court finds that as of the end of April 2003, BNE had no good will.

### c. Co-opting BNE's Identity

■ The trustee complains that Nicholas/Earth "co-opted" BNE's business opportunities and customer relationships by (1) obtaining certification as a minority business enterprise, (2) using similar company names, Bob Nicholas Enterprise, Inc. and Nicholas/Earth, and (3) using marketing materials that show that the founders of Nicholas/Earth also founded BNE and that imply that Nicholas/Earth is a partnership between BNE and Earth/Color. As to the third item, the Court finds that none of the defendants or the principals of Nicholas/Earth has marketed Nicholas/Earth as a partnership between BNE and Earth Color. Further, it is true and not misleading, that the founders of BNE also founded Nicholas/Earth.

■ Nicholas/Earth is not located at the same address that housed BNE, does not use the same phone number that BNE used, does not have the same corporate logo, and does not have any tangible or intangible assets that were once BNE's. To the extent that the trustee complains that Bob Nicholas has used his own name in two businesses, Bob Nicholas Enterprises, Inc. and Nicholas/Earth, Texas law does not generally restrict one from using one's own name in business. *Sarris v. Christie,* 217 S.W.2d 99, 102 (Tex.Civ. App.—Dallas 1949, writ refused n.r.e.)("It is now well settled, we think, that every person has the right to honestly use a name in his own business and any injury resulting from such use is damnum absque injuria; provided he does not resort to any artifice or do any act calculated to mislead the public as to the identity of the estab-

---

4. Proof that Earth Color paid bankruptcy counsel fees for BNE is insufficient to prove a transfer of goodwill.

lishment or to produce injury to the other beyond that which results from the similarity of the names"); *Rice v. Angell,* 73 Tex. 350, 11 S.W. 338, 339 (1889)(Where the names of the partners constituted the name of the firm either partner held the undoubted privilege to continue the same business in his own name so that upon the dissolution of the partnership there was nothing left which would probably draw to it the custom of the firm.)

As to the trustee's complaint that Nicholas/Earth "co-opted" BNE's status as a minority-owned business enterprise, that status was not property of the corporation. A corporation's status as a minority-owned business enterprise depends on the characteristics of the shareholders of a corporation. Each corporation must apply for certification as a minority-owned business enterprise, certification is not transferable and is subject to revocation in the event ownership of the business changes.

### d. Confidential Information

The trustee complains that James Litteken used BNE's confidential information on customer pricing when taking Weyerhauser's work order. The evidence shows however, that Litteken did not offer special pricing, Weyerhauser requested that it pay the same price that BNE had previously charged it. The evidence further shows that non-competitive pricing was BNE's downfall. Customer information has value and its confidentiality is protected when it provides its holder with an advantage over competitors. BNE's customer pricing structure caused it to fail.

██ The trustee complains that Bob Nicholas disclosed BNE's client list to Earth Color, suggesting that this was confidential information of value to BNE. The evidence shows however, that far from considering its client list as a confidential trade secret, BNE, through the Nich-

olases, advertised, at every opportunity, in speeches and in magazine articles, its clients' names and the work BNE was to perform for them throughout BNE's existence.

██ A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *In re Bass,* 113 S.W.3d 735, 739 (Tex.2003). To determine whether a trade secret exists, Texas courts employ a six-factor test: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* Misappropriation of trade secrets is shown by proof: (1) that a trade secret existed, (2) that the trade secret was acquired through a confidential relationship, and (3) that the defendant used the trade secret without authorization from the plaintiff. *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1262 (5th Cir.1987). The Court finds that BNE did not have any trade secrets or confidential information and none were transferred to defendants.

### e. Non-competition Agreement

The trustee complains that Bob Nicholas disclosed BNE's customer information and now works for Nicholas/Earth in violation of the non-competition agreement he signed in 1999. The trustee seeks damages for breach of the non-competition

agreement from Earth Color which was not a signatory to the agreement. The Court notes that indeed none of the defendants is a signatory to the non-competition agreement and the trustee has never sued Bob Nicholas to enforce the non-competition agreement.

 Enforcement of non-competition agreements in Texas is governed by statute. Texas law provides:

§ 15.50. Criteria for Enforceability of Covenants Not to Compete

(a) Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Comm.Code § 15.50.

The evidence shows that Bob Nicholas signed the non-competition agreement so that BNE could obtain a printing press. The receipt of the printer was consideration flowing to BNE the corporation, not to Bob Nicholas individually. Bob Nicholas did not execute the agreement in connection with BNE's agreement to employ him nor in connection with a promise by BNE to give him special training or confidential information. Bob Nicholas himself did not operate the printer obtained by virtue of his execution of the document. The Court finds that the non-competition agreement fails for lack of consideration. *See Alex Sheshunoff Management Services, L.P. v. Johnson,* 209 S.W.3d 644, 650–51 (Tex.2006) (not released for publication) ("We understand why the Legisla-

ture and the courts would not allow an employer to spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the employer. '[A]n agreement not to compete, like any other contract, must be supported by consideration.' *DeSantis,* 793 S.W.2d at 681 n. 6. The Act, as we now read it, addresses this concern. The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer. *See, e.g., Martin v. Credit Prot. Ass'n, Inc.,* 793 S.W.2d 667, 669 (Tex.1990) (holding employment agreement consisting entirely of a covenant not to compete unenforceable because the covenant 'must be supported by valuable consideration').")

 If an employer's customers can be readily identified by someone outside its employ or the employer fails to show that knowledge of its customers carries some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves, the employer has failed to demonstrate a need to protect confidential information by limiting an employee's right to compete. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670 (Tex.1990). Likewise, an employer fails to show a need to protect confidential information by limiting an employee's right to compete where the employer fails to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not be obtained from the customers themselves. *Id.* The trustee has failed to show a need to protect BNE's customer list and information.

 Further, as the agreement prohibits Bob Nicholas from engaging in the printing business in competition with BNE beyond the time BNE ceased operating, it

imposes a greater restraint than necessary to protect the goodwill or business interests of BNE. The Court finds the covenant not to compete is unenforceable and BNE has suffered no damages as a result of Bob Nicholas' employment subsequent to BNE's cessation of operations at the end of April 2003 or through any disclosure by BNE employees of information concerning client identities, preferences, pricing, or existing or prospective work.

### f. Damages

The trustee's expert, Terry Musika, testified that BNE was damaged in the amount of $49,891.64, due to the loss of the purchase orders and damaged in the amount of $3.1 million from the loss of its intangible assets. In *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276 (Tex.1994), the Texas Supreme Court stated the rule for recovery of lost profits as follows:

> We stated the rule for recovery of lost profits in *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938):
>
>> The various legal encyclopaedias and textbooks lay down certain rules applicable to an action for damages for loss of profits. [T]he rule is stated in the following language: "The generally accepted rule is that, where it is shown that a loss of profits is the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must

not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness." (citation omitted).

The rule as announced by the decisions of the courts of this state is summarized ... as follows: "In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions." (citation omitted).

. . . .

The rule denying a recovery where the facts show that such profits claimed are too uncertain or speculative, or where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands. (citations omitted).

. . . .

Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

. . . .

The businesses in the former cases actually operated at a profit, albeit for a short time; Teletron never did. Teletron's expectations were at best hopeful; in reality, they were little more than wishful.

Teletron strenuously argues that even TI thought its projections were reasonable. The fact that TI shared Teletron's hopes adds no substance to them.

*Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276 (Tex.1994).

The source of the financial information which forms the basis of Musika's opinions on the value of BNE's intangible assets and of damage to BNE due to their loss is the Monitor Clipper document. Musika testified on direct as follows:

Q Let's go to your second reference point. Can you frame that for us please, sir?

A Yes. In the second reference point I speak specifically and directly to the anticipated cash flow that BNE at the time contemplated as did Earth/Color in the document that has been marked as Plaintiff's Exhibit 79. So basically I went directly to the projections that were prepared by Earth/Color and negotiated and reviewed with BNE. I looked directly to those and identified the cash flow that was identified at the time and then valued that cash flow by actually conservatively bringing it back to 2003 on a present value basis.

. . . .

A . . . the damage amount associated with the second reference point and that is $1,859,011 and that is reflected on my Exhibit K.

Q Okay.

A If we go back from there now to where your question, pending question was: What did I use from Exhibit 79 to get to that 1.8-million? I used what is reflected on Exhibit G– I'm sorry not G–Exhibit E.

Q Okay.

A So if we'd turn to Exhibit E, Exhibit E is my schedule but it is an exact reprint of what's contained in Plaintiff's Exhibit 79.

Q Okay. And let's do that. Looking at Exhibit E going down to "Operating Income"—

A Yes.

Q Okay. If you look at that number and everything above it did you get all of that information from Exhibit 79?

A I did. And specifically that would be MCP00062. I basically copied what was on that document and put it on my Exhibit E down to "Operating Income".

Q Okay.

A I need to point out one thing, if I may?

Q Yes, please do so.

A The numbers, the detailed numbers are the same but I noticed in so doing it that there was a math error in the Plaintiff's—I'm sorry—in the defendants' document, so I corrected the math error, therefore, my num-

bers—the final "Operating Income" numbers are slightly lower on Exhibit E versus what's on MCP00062. I think it's just a rounding problem, but I've been more conservative. I've corrected for the math and used a lower operating income.

Q Okay. And so in terms of your analysis and where it begins on reference point two the operating income numbers at MCP62 of Exhibit 79 are— except for any mathematical issues are the same as the operating income on your Exhibit E to your report; is that correct?

A Yes.

Q Okay.

A Just for point of reference if you looked at MCP00062 and looked at the bottom line, "Operating Income" for example in 2003 it says, "Zero" and in my "Operating Income" there I say, "$100,000." In the next one it says on the defendants' document, "800,000". I say, "600,000." The next "1.2–million" they say; I say, "900,000" so you can see they're slightly different. If you looked at the detailed numbers up above you'd see that they were the same. Once again, I think they've got a math error.

Q Okay. Now—so now we know where you get the operating income in you Exhibit E; what did you do next for reference point two to get to the 1.859—million?

A I carried that cash flow that defendants had specifically expected, anticipated and prepared in their Exhibit 79 and I carried it over to Exhibit K of my report. So the top line of Exhibit K is just the exact same line from what was Exhibit E.

. . . .

Q Now focusing on Exhibit K tell the Court and counsel what you did with those numbers that effectively have come indirectly out of Exhibit 79.

A Repeating again that those numbers that come directly out of 79 are the anticipated cash flow and what I did next was to divide that cash flow that's on Exhibit K into two groups. One group would be revenue associated with prior BNE customers or anticipated BNE customers—that's the first line underneath—and then the second line would be the difference would be non-BNE associated customers . . .

. . . .

A . . . I've divided the total cash flow into these two groups—that being BNE-related and non-BNE related.

. . . .

A having reduced the overall cash flow amount now for this component we've just discussed, the next thing I did was to take these anticipated future dollars and bring them back to a basis that would value it as of the date of the transfer that being as of 2003 . . .

. . . .

Q If you turn to Exhibit I of your report can you tell us whether or not that part of your report reflects this analysis that you conducted?

A Well, it's exactly the same as Exhibit K . . .

Q Okay, sir. And with regard to that reference point which number—or what number do you arrive at?

A I then discount this cash flow which now has the premium margin in it. I discount it in exactly the same way and I come to a value of $4,003,417.

**710**

(Docket no. 117, transcript, direct examination, Terry Musika, July 12, 2006, p. 31, l. 23—p. 43, l. 15.)

Musika then explains that he "weighted" the figures he had derived to conclude that BNE incurred damages of $3,100,000. On cross-examination, Musika testified as follows:

Q Let's take the sales orders to start with. Your opinion of the value of the sales orders is based on an analysis that you did about what profit you thought they might generate; is that correct?

A Yes.

Q And, similarly, with respect to the goodwill and other intangibles, your opinion as to value is based on an analysis of what you think the profit that they could have generated is; is that correct?

A The discounted cash flow, which in some ways relates to profit, yes.

Q Okay. Now, I'd like to focus in on the six pre-petition work orders for the moment. See if I understand this correctly. Let's turn to Exhibit C, for a second, of your report, if we could. Now I think you said this morning—I would just like to confirm. Am I correct in understanding that your analysis here is very straightforward—you take the total invoice price of each of these work orders and you've multiplied it by 27.2 percent; is that correct?

A Yes.

Q Okay. And that 27.2 percent is based on some incremental profit numbers that you've derived from the Monitor Clipper presentation that we talked about this morning that was given to Earth/Color's banks; is that correct?

A . . . Right, I'll go with it.

. . . .

Q . . . the conclusion of your analysis is that these six jobs could have been done on an outsourcing basis . . . by BNE for the profit amount you indicated; is that correct?

A Yes, that's correct.

Q And, now, you said this morning, didn't you sir, that it was your opinion that the 27.2 percent profit was reasonable; is that correct?

. . . .

A Yes.

Q Is it your opinion that that's what the actual profit on those jobs was, sir?

A I don't believe that Earth/Color has ever disclosed what the actual profit is . . .

. . . .

Q So let me understand this correctly. . . . The thing we're talking about being transferred, sir, am I correct, is those six work orders at the price BNE would have charged for those jobs; is that correct sir?

A Not necessarily, no.

. . . .

Q What do you think BNE would have charged for those jobs at that time?

A The amounts that are reflected on the sales orders.

. . . .

Q Okay. Now hypothetically, if the evidence showed that, in fact, the price that was invoiced here was $30,000 below the cost that it took Earth/Color to produce this job, would that affect your opinion of the value of the job, sir?

A No.

. . . .

A BNE would charge, as the broker— as an outsourcing broker for this

work, the amounts that are on this invoice . . .

. . . .

Q Did you look at what Earth/Color or someone like that would have charged for such a job?

A No, I don't know how that would be done.

. . . .

Q And I'm saying sir, if, hypothetically, the market price to get this job done on an outsourcing basis was a hundred and thirty-eight thousand dollars, how valuable would this job have been to BNE on an outsourcing basis?

A It would be what the market would dictate and what their arrangement between the parties established would be the profitability to them. . . .the fact that Earth/Color may lose money . . . that doesn't mean they're not going to have to pay market rates to the broker and that the broker isn't going to make money.

. . . .

Q But you said, sir, that the brokerage margin was 10 percent; is that correct, sir?

A No, I said that that was an increase that the parties agreed to, that they would—they would and could charge on the work that would be a part of the joint relationship between BNE and Earth/Color.

. . . .

Q Sir, does your report determine— and opinion determine what a hypothetical willing buyer would have paid for the goodwill and other intangibles?

A It may have but that was not the objective, as I stated. So I can't say

that I undertook that analysis to determine that or not.

. . . .

Q Okay. I'd like now to turn to the last two data points, if I could, sir, the 1.86 and the 4 million.

A Yes.

Q Now, I think you said before, if I understood correctly, that these are based on discounted present value of cash flows; is that correct?

A That's correct.

Q Okay. And based on your weightings of 30 percent and 60 percent, these are the principal things that led you to the conclusion of what you said was, Value of the goodwill and other intangibles of 3.1 million; is that right, sir?

A Yes.

. . . .

Q Right. Now, the joint venture, which is what you said you were valuing at the time?

A The cash flow produced from the joint venture that was expected by BNE, its share of the joint venture cash flow.

. . . .

Q Okay. All right. Now I think I'd like to turn to the projections that you used, okay?

A Okay.

Q And, again, I want to kind of talk about both data point two and data point three kind of together. Am I correct, sir; they're based on the same set of projections that came out of the Monitor Clipper document; is that correct?

A That's a correct statement.

. . . .

Q Hypothetically, sir, if Nicholas/Earth is having sales in the first half of

2006 that are 50 percent below that projection, would that lower your opinion of value?

A No.

Q And I take it, sir, that's because the actual performance does not affect your opinion of value; is that correct?

A The value is based on the expected cash flow that would accrue to and come to BNE taken at the time of 2003.

. . . .

Q I thought you said, sir, you weren't valuing BNE. You were valuing the joint venture and that your opinion was as to the joint venture and not BNE?

A That's absolutely wrong.

Q Am I correct, sir?

A That absolutely misstates my testimony. What I said I was valuing was the future cash flow that the joint venture would produce and provide to BNE but for the actions on behalf of the Defendant.

. . . .

Q And do you know whether the projections, that we were just talking about, assume that most of that work was going to be sheet-fed or web based?

A At the time that I performed my valuation, I did not know and didn't have any—didn't prepare any analysis regarding that.

Q Now, if hypothetically, the projections assume that it was all going to be sheet-fed business, when in fact it turned out to be mostly web-printing business; would that affect your opinion of value?

A No.

Q Okay. now you said—you've been saying you valued the cash flows of the joint venture; is that right?

A Anticipated cash flows, yes.

Q And used that value for your value of goodwill and other intangibles; is that correct?

A Yes, that's correct.

Q Now, did you subtract the value of any tangible assets at all from the valuation of the joint venture?

A No.

Q Would it be appropriate to deduct that value?

A If there were any.

. . . .

Q You see that? Do you know what the new sales represent sir?

A My understanding is those are sales that are going to be performed, by and large, as part of the new joint venture or by the new joint venture and not outsourced to Earth/Color.

Q So that would mean that they would be produced on the joint venture's own printing equipment; is that right, sir?

A That's what was contemplated, I believe. Yes.

Q Okay. And do you know how many printers the joint venture had or has currently?

A Has currently? No, I don't.

Q Do you know sir, how many sheet-fed printers it would take to produce the amount of new sales that are in this?

A No. I mean I—no.

Q So you didn't analyze at all how many tangible assets this would take?

A No.

. . . .

Q Well, sir, I thought you were saying that the premise was that they could have—BNE could have continued and done all this work on an out-sourcing basis; is that correct?

A No, that's not the premise of the valuation. No, that is not what I said at all. . . . The basis of the valuation is entering into the joint venture, as was contemplated; not as a brokering arrangement.

Q So its's really the value of the potential joint venture interest that you were valuating?

A I think I've said that all along.

(Docket no. 117, transcript, cross-examination, Terry Musika, July 12, 2006, p. 54, l. 4—p. 131, l. 17.)

All of the projections contained in the Monitor Clipper document are based solely on historical financial information about Earth Color pre-dating the existence of the joint venture and Earth Color's investment in or loan to the joint venture. Although the document notes that BNE has struggled with little cash and is deeply in debt, it contains no historical or projected financial data about BNE. The document contains no actual financial data about the proposed joint venture as of the date of its creation or thereafter.

■ The financial projections contained in the document are based on the assumption that Earth Color will loan substantial operating cash to the venture, the joint venture will out-source sheet-fed work to Earth Color, and Earth Color will exploit its existing work force and equipment performing the sheet-fed work. The projections contained in the document as they pertain to the joint venture are hypothetical. Therefore, while the document may have been sufficient to satisfy bankers concerning the potential profitability of the proposed joint venture from Earth Color's perspective, it contains no factual informa-tion useful to a calculation of lost net profits of BNE resulting from the transfer of the six purchase orders to ECH or to a calculation of the value of BNE's good will or other intangible assets allegedly transferred to or "co-opted" by the defendants. Prospective profits, which are too speculative for recovery otherwise, cannot be recovered by capitalizing them and calling them good will. *Sherwin–Williams Co. v. Perry Co.,* 424 S.W.2d 940 (Tex.Civ.App.Austin 1968, writ ref'd n.r.e.).

As all of Terry Musika's calculations were based on the numbers contained in the Monitor Clipper document, his calculations and his opinions are not useful to the Court because they do not show lost profits or the value of the corporate intangibles with reasonable certainty based on objective facts, figures, or data. In fact, even had the financial data in the Monitor Clipper document been actual data concerning BNE or the joint venture as it operated, Musika did not subtract the value of the tangible assets necessary to produce the cash flows and goodwill from his figures, a calculation which he agrees would be appropriate in calculating goodwill.

The data underlying Musika's calculations is speculative and pertinent only to showing in general terms that an investment in the proposed new business might be profitable to Earth Color if the new business performs in accordance with the assumptions underlying the document. The evidence at trial showed, however, that the new business did not perform in accordance with the assumptions underlying the Monitor Clipper document. The new business did not actually generate the amount of sheet-fed work underlying the projections in the document. Consequently, Earth Color was not able to utilize its existing equipment in the manner projected. Instead of meeting the projections

based on the assumptions underlying the document, the new business lost money until Sprint and Verizon became clients and Earth Color acquired web-based printing presses at a cost of $6 million. The Monitor Clipper document does not include projections based on the acquisition of additional web-based printing equipment. Musika testified that his calculation of damages based on the projections contained in the Monitor Clipper document would not differ if the actual performance of the new company differed from the projections. In Musika's view, the Monitor Clipper document is an enforceable agreement requiring Earth Color to pay the profit percentages shown in the document. The Monitor Clipper document is not, however, a contract subjecting Earth Color to pay the new company the amounts shown therein and Musika's failure to take into account the actual performance of the new company renders his calculations unusable in this case.

### III. Conclusion

The Court finds that the trustee has failed to prove: (1) that any assets of the debtor were transferred; (2) that debtor had acquired rights in any assets allegedly transferred; (3) that debtor received less than reasonably equivalent value for any transfer; (4) that anyone acted with actual intent to hinder, delay, or defraud any creditor of BNE; or (5) that transfers were made at a time when debtor was engaged in business or about to engage in business for which its remaining assets were unreasonably small, as the Court finds that BNE closed business at the end of April 2003 before any of the alleged transfers took place.

The Court concludes that the trustee has failed to prove the fraudulent transfer or the unauthorized post-petition transfer of any asset of BNE. As liability of a transferee under 11 U.S.C. § 550 is predi-

cated upon avoidance of a transfer under §§ 548 or 549, the Court finds that the trustee has failed to prove a cause of action under 11 U.S.C. § 550.