Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/07/2020 09:06 AM CST

Gerald C. Korth, appellee and cross-appellant,
v. Laura Luther and Michael Luther,
appellees and cross-appellees, Atelier
Partners, intervenor-appellee and
cross-appellant, David J. Koukol,
appellant, and Kathryn J. Derr,
appellee and cross-appellant.

Gerald C. Korth and Atelier Partners,
appellee and cross-appellants, v. Laura
Luther and Michael Luther, appellees
and cross-appellees, David J. Koukol,
appellant, and Kathryn J. Derr,
appellee and cross-appellant.

___ N.W.2d ___

Filed November 15, 2019.    Nos. S-18-670, S-18-671.

1. **Conveyances: Fraud: Equity: Appeal and Error.** An action under the
Uniform Fraudulent Transfer Act is equitable in nature, and an appeal of
a district court's determination that transfers of assets were in violation
of the act is equitable in nature.
2. **Equity: Appeal and Error.** In an appeal of an equity action, an appel-
late court tries factual questions de novo on the record, reaching a con-
clusion independent of the findings of the trial court, provided, however,
that where credible evidence is in conflict on a material issue of fact, the
appellate court considers and may give weight to the fact that the trial
judge heard and observed the witnesses and accepted one version of the
facts rather than another.
3. **Judgments: Appeal and Error.** When reviewing questions of law,
an appellate court resolves the questions independently of the lower
court's conclusions.

4. **Judgments: Pleadings.** A motion for judgment on the pleadings is properly granted when it appears from the pleadings that only questions of law are presented.

5. **Attorney Fees: Appeal and Error.** On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.

6. **Conveyances: Fraud: Debtors and Creditors: Proof.** In an action to set aside an actually fraudulent transfer or obligation under Neb. Rev. Stat. § 36-705(a)(1) (Reissue 2016) of the Uniform Fraudulent Transfer Act, it is the plaintiff's burden to prove by clear and convincing evidence that (1) the debtor made a transfer or incurred an obligation, (2) the plaintiff was a creditor of the debtor, and (3) the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

7. **Conveyances: Fraud: Words and Phrases.** It is fundamental that before there can be a "fraudulent transfer" under the Uniform Fraudulent Transfer Act, there must be a "transfer."

8. **Actions: Parties: Appeal and Error.** An appellate court reviews a case on the theories pursued by the parties, not on a theory that the parties might have raised.

9. **Conveyances: Fraud: Property: Words and Phrases.** There are limits to how abstract an interest may be and still constitute "property" under the Uniform Fraudulent Transfer Act.

10. ____: ____: ____: ____. Whether under the Uniform Fraudulent Transfer Act there is a "subject of ownership" constituting "property" that can be an "asset" depends on a legitimate and identifiable claim of entitlement.

11. **Conveyances: Fraud: Debtors and Creditors.** A security agreement by the debtor in favor of an alleged transferee is the vehicle for disposing of or parting with an asset or an interest in an asset; for purposes of the Uniform Fraudulent Transfer Act, it is not the asset itself.

12. **Conveyances: Fraud: Property: Debtors and Creditors: Estates: Liens: Words and Phrases.** Only equity in property in excess of the amount of encumbering liens thereon is an "asset" reachable by creditors as a fraudulent transfer; encumbered property is not considered part of the debtor's estate.

13. **Conveyances: Fraud: Debtors and Creditors.** A blanket security agreement does not convey an asset under the Uniform Fraudulent Transfer Act if everything subject to ownership that is described as

collateral therein is fully encumbered by other creditors with superior claims at the time of the alleged transfer.

14. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

15. **Actions: Attorney Fees: Words and Phrases.** Frivolous for the purposes of Neb. Rev. Stat. § 25-824 (Reissue 2016) is defined as being a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position in the lawsuit.

16. ____: ____: ____. Frivolous for purposes of Neb. Rev. Stat. § 25-824 (Reissue 2016) connotes an improper motive or legal position so wholly without merit as to be ridiculous.

17. **Actions.** Any doubt whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.

Appeals from the District Court for Douglas County: W. Mark Ashford, Judge. Affirmed in part, and in part reversed.

Mark C. Laughlin and Jacqueline M. DeLuca, of Fraser Stryker, P.C., L.L.O., for appellant.

Lisa M. Meyer, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee Gerald C. Korth.

Kathryn J. Derr, of Berkshire & Burmeister, for intervenor-appellee.

Richard L. Anderson and David J. Skalka, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., for appellee Laura Luther.

Maynard H. Weinberg, of Weinberg & Weinberg, P.C., for appellee Michael Luther.

Julie Jorgensen, of Morrow, Willnauer & Church, L.L.C., for appellee Kathryn J. Derr.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

This consolidated appeal involves two actions brought under Nebraska's Uniform Fraudulent Transfer Act (UFTA)[1] by two creditors. The creditors alleged in both actions that a blanket security agreement guaranteeing repayment of a loan by a wife to her husband was a fraudulent transfer under the UFTA. The amount loaned to the husband was paid directly to the Internal Revenue Service (IRS) to satisfy a settlement agreement between the husband and the IRS relating to the husband's unpaid taxes. When the husband signed the blanket security agreement, the IRS liens were still outstanding and the husband made ownership claims to little other than contingent expectancy interests in past and future business ventures. After receipt of the funds, the IRS extinguished the liens and dismissed the lawsuit, which sought to foreclose against the marital home that was titled solely in the wife's name. Following a trial in one of the actions, the district court determined that there was no actual intent to hinder, delay, or defraud any creditor under the UFTA and, in any event, that the wife had proved good faith. The court ultimately granted the wife attorney fees as sanctions against the creditors and their attorneys on the grounds that both actions were frivolous. We affirm in part and in part reverse.

## II. BACKGROUND

### 1. Prior Judgments in Favor of Creditors

In July 2001, Gerald C. Korth was awarded a judgment against Michael Luther and a company then owned by Michael, Aden Enterprises, Inc., in the amount of $1,392,328.50. The judgment was entered as a sanction for discovery violations. Korth subsequently sought orders in aid of execution, but was unsuccessful in securing any assets. On October 4, 2016, the

---

[1] Neb. Rev. Stat. §§ 36-701 to 36-712 (Reissue 2016) (subsequently repealed and replaced by Uniform Voidable Transactions Act, 2019 Neb. Laws, L.B. 70).

district court released Terra Nova Carbon Energy Company, LLC (Terra Nova); Terra Nova's chief executive officer; and other entities on the grounds that they had proved they possessed no money, property, or credits of Michael at the time garnishee interrogatories were served and should accordingly be discharged of any garnishee liability.

In an unrelated action in June 2007, Atelier Partners (Atelier) obtained a money judgment against Michael in the amount of $152,898. Atelier was unable to execute on its judgment to any degree until May 2013, when Michael's stock interests in several business entities, including Luther Capital Management, L.L.C. (Luther Capital), and Luther Corporation, were auctioned off at a sheriff's sale following public notice. Atelier purchased the interests for $1,000.

### 2. Other Lawsuits by Atelier or Korth

A prior action by Atelier (the 2012 Atelier action) against Laura Luther and Michael, her husband, had sought to set aside a $2 million cash conveyance to Laura from Michael and the acquisition of the marital home in Laura's name. The action was dismissed with prejudice as barred by the statute of limitations.

### 3. IRS Action to Enforce Tax Liens

Between 2007 and 2009, the IRS filed with the Nebraska Secretary of State notices of a federal tax lien against Michael in a total amount of approximately $1 million. On February 12, 2012, the IRS sued Laura and Michael for the collection of unpaid taxes owed by Michael (the IRS action). The IRS sought a judgment against Michael in the total amount of $1,266,227.20 for federal personal income taxes and penalties for the years 2004 through 2007 and trust fund recovery penalties for 2001 and 2002.

The IRS named Laura in the suit because it sought to foreclose its tax liens against the home that Laura and Michael lived in, which was titled only in Laura's name. The IRS alleged that Michael provided money to Laura to purchase

the home and that Michael had retained beneficial use and equitable ownership of the home. The IRS joined, as persons that may claim an interest in the property, Atelier, Korth, and several other creditors of Michael.

Michael reached a settlement agreement with the IRS in which he agreed to pay the IRS $450,000 to satisfy the tax debts owed by him as of March 24, 2014. In exchange, the IRS agreed to dismiss the case with prejudice as against Laura and Michael and not take further collection action against the home or certain transfers of property between Laura and Michael. The IRS also agreed to terminate the tax liens after receipt of the $450,000.

## 4. $450,000 LOAN AND CORRESPONDING SECURITY AGREEMENT

Laura agreed to loan Michael $450,000 in order to pay the settlement, because Michael lacked the funds to do so. On March 20, 2014, Michael signed a security agreement to secure payment of the loan, which was reflected by a demand note also dated March 20, 2014, in the original face amount of $450,000.

The security agreement described that it was to secure payment of the "Obligations," which were defined as the March 20, 2014, demand note in the original face amount of $450,000. The security agreement then described the collateral for such obligations as follows:

"Collateral" means the following personal property, assets, and rights, wherever located, whether now owned or hereafter acquired or arising, in which [Michael] now has or hereafter acquires an interest and all proceeds and products thereof: all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not

the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles). [Laura] acknowledges that the attachment of [her] security interest in any additional commercial tort claim as original collateral is subject to [Michael's] compliance with this agreement with respect to commercial tort claims.

The Collateral shall also include, as applicable, all (i) products of the Collateral; (ii) substitutions and replacements for the Collateral; (iii) proceeds from the sale or disposition of the Collateral, including insurance proceeds and any rights of subrogation resulting from the damage or destruction of the Collateral; and (iv) for Collateral that is tangible, all additions, increases, improvements, accessories, attachments, parts, equipment and repairs now or in the future attached to or used in connection with such Collateral, and any warehouse receipts, bills of lading or other documents of title now or in the future evidencing [Michael's] ownership of the Collateral.

### 5. First UCC Filing

On March 20, 2014, a Uniform Commercial Code (UCC) financing statement was filed with the Secretary of State, describing Michael, at his mailing address, as the debtor and Laura as the secured party. It described the collateral in the same terms as those set forth in the security agreement.

### 6. Payment of IRS and Dismissal of Claims

The $450,000 was transferred from Laura's brokerage account to her attorney's trust account, from where it was transferred directly to the IRS on March 24, 2014. Subsequently, the IRS terminated the tax liens and the court dismissed with prejudice the IRS action as against Laura and Michael. The court thereafter dismissed any and all claims against the United

States with prejudice and any and all pending claims asserted by any defendant against any coparty without prejudice.

### 7. Collateral Control Agreement

On March 19, 2014, a collateral control agreement was signed by Michael, Laura, and Koch as chief executive officer of the "account debtor," Terra Nova. The agreement described that Terra Nova "may now or in the future hold accounts, general intangibles, or other elements of the Collateral for [Michael], and acknowledges [Laura's] security interest in the Collateral." Terra Nova further "acknowledges, without immediate verification, that it is not aware of and has not been given notice of any other security interest existing on the Collateral." Terra Nova subordinated in favor of Laura "any security interest or lien [Terra Nova] may have, now or in the future, against the Collateral, except that [Terra Nova] will retain its right of setoff in the account."

### 8. Korth Filed Complaint Alleging Security Agreement Was Fraudulent Transfer

On January 14, 2015, Korth, represented by attorney David Koukol, filed a complaint against Laura and Michael alleging that the security agreement and the financing statement that recorded that agreement reflected a fraudulent transfer. The complaint did not seek to void the collateral control agreement. Korth's complaint was filed under case No. CI 15-299 (CI 15-299).

### 9. Laura's and Michael's Answers to Complaint in CI 15-299

Laura and Michael, in their answers to the complaint, denied that Korth had a lien on Michael's personal property at the time of the collateral agreement, elaborating that he had not successfully seized in execution any of Michael's property pursuant to Neb. Rev. Stat. § 25-1504 (Reissue 2016). Further, they denied any intent to hinder, delay, or defraud. They alleged that a lien in favor of Laura in the sum of $450,000 replaced liens filed by the IRS against Michael's assets in the amount

of $1,266,227.20 plus interest and penalties and that the IRS liens were superior to Korth's interest in Michael's assets and would have had to have been satisfied before Korth could have executed upon Michael's assets. Thus, Laura and Michael argued, the loan and corresponding security agreement being challenged by Korth had placed Korth in a better position to collect against Michael's assets than Korth had been in before the loan transaction. Laura and Michael asserted that even without the security agreement and UCC financing statement that allegedly represented the fraudulent transfer, under the doctrine of equitable subrogation, Laura's interest in Michael's assets in the amount owed under the loan would still be superior to Korth's creditor interest.

Laura and Michael asserted that Korth's claims against them were frivolous and asked that sanctions be awarded pursuant to Neb. Rev. Stat. § 25-824 (Reissue 2016). Michael's attorney filed an affidavit stating that he had notified Koukol of his intent to enforce sanctions under § 25-824 against both Korth and his attorneys.

### 10. Cross-Motions for Summary Judgment or Partial Summary Judgment in CI 15-299

Laura and Michael both moved for summary judgment in CI 15-299, asking that Korth's complaint be dismissed with prejudice. They asserted that no fraudulent transfer had been pled or could be proved. Korth filed a motion for partial summary judgment asking the court to declare that the UCC financing statement was ineffective as a matter of law, because the description in the agreement of the collateral was too broad and the filing failed to reflect Michael's middle initial, which is present on his driver's license.

At the hearing on the motions, the court received Laura's and Michael's deposition testimony.

### (a) Michael's Deposition

Michael described that his work involves providing corporate finance services either individually or through Luther

Capital. Michael indicated that he was generally paid for his services by a percentage of project revenues, if they materialized, on a kind of contingency or equity ownership basis. He described that his equity and stock interests in several companies he had worked with had been subjected to execution.

Michael explained that at the time of the loan, he had anticipated receiving a payment from Terra Nova. Michael elaborated that he had a loose oral agreement with Terra Nova to receive approximately $100,000 for past services performed on a particular project, if and when Terra Nova realized sufficient profits. He had intended to give that payment to Laura as partial repayment of the loan. Michael testified that both at the time of the security agreement and as of the time of the deposition, he owned no real property and possessed personal property of only nominal value.

Michael admitted, over his counsel's objection, that he had given Laura $2 million in 1999 or 2000. This transfer was the subject of the 2012 Atelier action which was dismissed as barred by the statute of limitations. Michael did not know what Laura had done with the money or whether, approximately 14 years later, she used that money to effectuate the loan that enabled him to pay the IRS settlement.

Michael could not recall if he had made any interest payments to Laura on the loan. The evidence was undisputed that at the time of the summary judgment hearing, Michael had made no payments toward the principal. Michael described that Laura orally demanded payment on the note "every day." Michael testified that he owed Laura the money lent to him as reflected in the security agreement and that he intended to repay her.

### (b) Laura's Deposition

In her deposition, Laura testified that she was the sole titled owner of the residence where she and Michael lived, which had been paid for in cash by Michael in 2000. Most of Laura's testimony concerned whether Michael had any assets. There were none that she could identify.

### (c) Other Evidence

Korth submitted evidence that Michael had numerous unsatisfied judgments in favor of various entities against either Michael personally or Luther Capital in a total amount of approximately $9 million.

Other evidence demonstrated that on May 5, 2015, a second UCC financing statement was filed reflecting the collateral pledged to Laura under the security agreement—this time with Michael's middle initial. Evidence was submitted, and it was later stipulated, that the standard search logic used by the Secretary of State's office to search filings under the UCC changed on May 4, 2015. Before May 4, a search for "'Michael S. Luther,'" the name on Michael's driver's license, would not retrieve the financing statement reflecting the security agreement that was with "'Michael Luther.'" After May 4, it would.

### 11. Order Denying Motions for Summary Judgment in CI 15-299

On July 6, 2015, the court denied Korth's motion for partial summary judgment on the ground that he was making a premature claim for declaratory relief. The court explained that Korth was seeking through his motion a declaration of lien priority when there were no assets or funds that the parties were identifying as being subject to a lien priority contest. Further, the court reasoned that it would not rule on a motion for summary judgment dealing with lien priority and perfection issues when those issues were not presented in Korth's complaint.

Despite this conclusion that there were no assets that the parties were fighting over, the court also denied Laura's and Michael's motions for summary judgment. Citing *Matter of Holloway*,[2] the court first explained that it was rejecting any argument that the UFTA does not apply to the grant of security interests. The court did not otherwise address whether it mattered that the only identified interests transferred by the

---

[2] *Matter of Holloway*, 955 F.2d 1008 (5th Cir. 1992).

security agreement were future contingent expectancy interests. Nor did the court address whether there could be a "transfer" under the act if the debtor's assets at the time the security agreement was executed were subject to a lien superior to the creditor's rights.

Instead, the court focused on Laura and Michael's argument that because there was no genuine issue that the grant of the security interest was for a reasonably equivalent value and that Laura took the security interest in good faith, she had a complete defense as a matter of law under § 36-709(a). The court found there was no genuine issue that a reasonably equivalent value was exchanged for the assets transferred through the security agreement. However, the court found a genuine issue of material fact as to whether the transfer was made in good faith. For that reason, the court denied Laura's and Michael's motions for summary judgment.

## 12. Intervention in CI 15-299

Atelier filed a complaint in intervention in April 2015 as another creditor seeking to set aside the alleged transfer effectuated by the security agreement and UCC filing. Atelier was represented by Kathryn Derr. Michael opposed intervention on the ground that Atelier's claim was already litigated and decided in the 2012 Atelier action. The court allowed the intervention after it ruled on the motions for summary judgment. In his answer to the complaint in intervention, Michael pled that the Atelier action operated as claim preclusion.

## 13. Denial of Leave to Amend in CI 15-299

On May 2, 2016, the court denied Korth's motion for leave to file an amended complaint. The court explained that the motion was substantively identical to a prior motion for leave to file an amended complaint in May 2015, which had been denied because it was made in response to Laura's and Michael's motions for summary judgment. In addition to repeating the allegations of fraudulent transfer, the proposed amended complaint asked the court to declare that the UCC

financing statement reflecting the collateral agreement between Laura and Michael was ineffective as a matter of law and thus not perfected and not entitled to priority over Korth's lien.

### 14. New Action, CI 16-3789, Filed and Transferred

Two days after the court denied Korth leave to amend, Atelier and Korth filed a new complaint in district court. The complaint was similar to the prior proposed amended complaint in CI 15-299, but added that another UCC financing statement had been filed on or about May 5, 2015. This complaint was filed as No. CI 16-3789 (CI 16-3789). Pursuant to an agreement, the case was ultimately transferred to the judge assigned to CI 15-299. The court ultimately determined the cases should be tried separately.

In their answers to the joint complaint in CI 16-3789, Laura and Michael denied most of the allegations, including the premise that any "asset" was or has since been transferred by the security agreement or that any UCC filing can grant a security interest. Laura and Michael affirmatively alleged, among other things, that the claims were frivolous and made in bad faith. They also alleged law of the case, issue preclusion, and claim preclusion based on the orders of dismissal in the IRS action and the 2012 Atelier action, as well as the district court's prior orders in CI 15-299 denying summary judgment and leave to amend.

### 15. Motions for Judgment on Pleadings in CI 16-3789

Laura and Michael moved for judgment on the pleadings in CI 16-3789 on the grounds that the complaint failed to allege there was an "[a]sset" as defined by § 36-702(2), which, pursuant to § 36-707(4), was required for there to be a transfer subjecting the transaction to the UFTA. Laura pointed out that Atelier and Korth had not alleged that either of them had ever seized in execution any of Michael's personal property; thus, she alleged they had no lien pursuant to § 25-1504.

At the hearing on the motions for judgment on the pleadings, Koukol's cocounsel, Michael Milone, described that since the court had already decided in its prior order on summary judgment that the transaction was for a reasonably equivalent value, Korth considered the remaining issue before the court in both cases to be good faith. Milone explained, "[T]he issues [in the complaint in CI 16-3789] are almost identical" to those of the complaint in CI 15-299 "except for that in the second complaint we're alleging that the second UCC financing statement really should be treated and analyzed by the Court in the same way as in the first." Milone stated of Korth, "[W]e're . . . not attempting to expand the pleadings beyond what we determined before you last May in summary judgment." Beyond there being a "separate transfer" by virtue of the second UCC filing, Milone asserted, "the issues are substantively identical between the two cases."

The court stayed proceedings on CI 16-3789 pending the outcome in CI 15-299 and explained that it was also postponing ruling on the motions for judgment on the pleadings until after the outcome in CI 15-299.

16. MOTION TO COMPEL IDENTIFICATION OF
"ASSETS" AND PROPERTY SUBJECT TO
SUPERIOR LIENS AND NOTICE

After a motion to compel Atelier and Korth to identify what assets were at issue under the UFTA, Korth identified $8.11 garnished from a brokerage account. Laura responded that the garnishment was of Luther Capital's assets and not of Michael's assets. And Luther Capital had been owned by Atelier since 2013. Laura disclaimed any interest in the garnished assets.

Atelier and Korth conceded at a hearing that beyond such funds, there were really no concrete interests they had knowledge of that had been transferred to Laura. Instead, it was their assertion that "the giving of the security interest, not conveyance of specific assets," was the fraudulent "transfer" under the UFTA.

### 17. Bench Trial in CI 15-299

A 3-day bench trial was held on CI 15-299. Before trial, Laura and Michael argued that as a threshold matter, there was no "transfer" of any "asset" under the UFTA due to the superior lien by the IRS in the assets described by the security agreement. They also argued that Michael lacked actual intent to defraud, and Laura argued that she received the security agreement in good faith.

#### (a) Stipulated Facts

For purposes of the trial, the parties stipulated as to the five notices of federal tax liens between September 19, 2007, and June 12, 2009, and to the details of the IRS action claiming Michael owed a total of $1,266,227.20 as of January 15, 2012, for amounts assessed between September 20, 2003, and September 25, 2008. They stipulated to the details of the settlement between Michael and the IRS for $450,000. The parties also stipulated that on September 20, 2013, the IRS filed a notice of a federal tax lien against Michael in the amount of $234,064.71 for tax years 2008 through 2012, which was not the subject of the settlement and remained outstanding.

The parties stipulated that other than the disputed garnishment of $8.11 from the brokerage account in the name of Luther Capital, Korth has never seized in execution on the Korth judgment. They stipulated that Atelier had neither seized in execution on its judgment at the time the notice of the federal tax lien for $545,472.96 was filed nor possessed any personal property of Michael that it had seized in execution as of March 20, 2014. Between March 20, 2014, and May 4, 2015, neither Atelier nor Korth had successfully seized any assets of Michael or garnished any rights to payment of Michael in execution on the Atelier or Korth judgments.

#### (b) Testimony of Mitchell Murphy

Mitchell Murphy, a finance and accounting professional, testified at trial as Atelier's and Korth's expert witness. Murphy

had reviewed financial documents pertaining to Laura and Michael for the period of 2011 through 2017.

Murphy testified that he did not see evidence of any wages, salary, or personal disbursement earnings for Michael. He observed only what appeared to be business income flowing into and between Michael's business and personal accounts. Murphy observed that while over the years, the level of business income had risen, there was no corresponding increase in business revenue. In other words, there did not appear to be any retention of any funds from the increased level of business and the account balances remained zero. Murphy summarized that a combination of commingling accounts, frequent and systematic transfers of funds, a practice of authorizing debits that could not be honored, and withdrawal and deposits of cash did not "look like what [he] see[s] in normal business activity." Murphy admitted on cross-examination, however, that he could not determine from the information he had reviewed whether any of the inflows or outflows were actually improper.

Murphy found nothing noteworthy in his review of Laura's accounts. He testified on cross-examination that he did not find it unusual that a blanket security agreement would be given in exchange for a $450,000 loan. Also, Murphy could find no evidence that in March 2014, Michael had transferred any actual property or assets to Laura.

### (c) Laura's Testimony

Laura testified largely consistently with her prior deposition testimony. She elaborated on matters surrounding the loan and security agreement. She testified that at the time of the loan and corresponding security agreement, she did not know anything about Michael's liabilities other than that Atelier and Korth were creditors joined in the IRS action. She did not discuss with anyone or even contemplate how the loan transaction would affect Atelier's or Korth's ability to collect. Laura explained that "there was no consideration of anything else except for myself and Michael and the IRS." Laura stated that

her only intention was to be paid back. The verbiage of the security agreement was crafted by her legal counsel.

### (d) Michael's Testimony

Michael testified that he had entered into the loan transaction with Laura because he did not have the funds to pay the settlement with the IRS. At the time of the security agreement, Michael had few assets. Mirroring his prior deposition testimony, Michael described that he had only some personal possessions and small sums in bank accounts. Michael testified that it was not his idea to create a security agreement, but that he signed the agreement crafted by Laura's legal counsel because Laura asked him to as a requirement for the loan. Michael testified that he did not enter into the loan transaction and its accompanying security agreement in order to make it more difficult for creditors to collect from him.

### 18. Judgment of Dismissal of CI 15-299

The court issued an order in CI 15-299 on September 1, 2017, finding that the case lacked merit and accordingly dismissing it with prejudice. The court rejected Michael's argument that the IRS was a necessary party to the action.

The court considered whether Atelier and Korth had proved by clear and convincing evidence that there was a fraudulent transfer under § 36-705(a), explaining that under that statute, there is a fraudulent transfer only if either the debtor had actual intent to hinder, delay, or defraud any creditor or the transfer was made without a reasonably equivalent value in exchange for the transfer and the debtor thereby dissipated assets or intended to incur or reasonably should have believed he or she would incur debts beyond the ability to pay. The court explained that since it had already determined there was a reasonably equivalent value exchanged in the loan transaction, the transfer was fraudulent under § 36-705(a)(1) only if there was an actual intent to hinder, delay, or defraud a creditor.

The court considered the factors set forth by § 36-705(b), which, among other factors, may be given consideration when

determining whether there was actual intent to hinder, delay, or defraud. The court found that Michael did not have an actual intent to hinder, delay, or defraud a creditor. The court elaborated that "[w]hile there are some 'badges of fraud' present in the current case, the majority of the evidence indicate[s] the absence of fraud in the challenged transaction." The court recognized as indicia of fraud that the transfer was to an insider, Laura, and that Michael had the Atelier and Korth judgments outstanding against him before the transfer was made. However, the court found supportive of an absence of fraud that the judgments were obtained a number of years before the security agreement, only interests in personal property were transferred, the obligation was not concealed, Michael did not abscond, none of the assets were removed or concealed, and there was an equivalent value. The court also found that "there can be no intent to hinder where the estate was improved in position rather than diminished." The court explained that the loan was intended and used to pay a settlement that extinguished IRS liens of higher priority than either the Atelier or the Korth judgment. This settlement "exchanged over $1.2 million in debt for $450,000 in debt, improving [Michael's] estate by more than $750,000 and putting Korth and Atelier that much closer to collecting on their judgment leins [sic]."

Further, as to the claim against Laura, the court found merit to Laura's affirmative defense of good faith under § 36-709(a). The court stated that it was "clear from the evidence that there was no intent on the part of Laura to defraud the creditors of Michael." The court found that there was "absolutely no evidence of intent to defraud on the part of Laura and that the good faith defense would be applicable." The court did not specifically discuss whether it was utilizing a subjective or objective standard of intent in determining whether Laura received the transfer in good faith.

The court found no merit to the conspiracy claim because Laura and Michael did not engage in the underlying tort, there

was no evidence of agreement between Laura and Michael to engage in a tort, and Laura had acted in good faith.

The court ordered that both Korth's and Atelier's claims of fraudulent transfer and conspiracy were without merit as to both Laura and Michael, and those claims were dismissed with prejudice. The court noted in its order that the parties had raised the issue of attorney fees, which would be determined at a separate hearing.

### 19. Order of Judgment on Pleadings in CI 16-3789

Laura and Michael again moved for judgment on the pleadings in CI 16-3789, this time based on issue and claim preclusion stemming from the September 1, 2017, order in CI 15-299. They again sought sanctions pursuant to § 25-824.

At the hearing on the motions, Laura and Michael argued with regard to attorney fee sanctions that from the time the litigation was filed, Atelier and Korth both knew that they did not have a lien interest superior to the IRS' interest that was extinguished by the loan. Atelier and Korth responded that there was a sufficient factual dispute to take the case to trial.

The court agreed with Laura and Michael. The court stated that "during the course of the trial it became abundantly clear, at least in [the court's] mind, that the only truly credible witness[' testimony] in the entire testimony of all the witnesses was that of [Laura]." The court explained that while it perhaps should have resolved the good faith defense by way of summary judgment, once the court heard the evidence at trial, "it was absolutely clear to [the court] that there was no legal, possible factual, legal, a combination of the two facts of law, that would support an inference of fraud on the part of [Laura]." Laura engaged in the transaction to protect her interest and nothing more. That, the court believed, should have been discoverable at the time of the pleadings.

The court expounded:

> [T]otally frivolous. Without question, it was known early on; there was consideration; it was a protection of her

interest; there was an IRS lien which would have been superior. I already made that clear. You people should have known that. You brought her to court, in my opinion, for no valid reason whatsoever.

On November 3, 2017, the court issued an order granting Laura's and Michael's motions for judgment on the pleadings. The court further found that the action was frivolous as to Laura. Although Michael had argued that one of the grounds for judgment on the pleadings and frivolousness was issue preclusion by virtue of Atelier's and Korth's failing to bring their claims in the IRS action, the court implicitly rejected that argument. The court's order referred to its prior findings pronounced at the hearing as the findings supporting its conclusion that the lawsuit was frivolous.

At a subsequent hearing, when Korth asserted that the court had failed to make specific findings relating to its frivolousness determination, the court responded that its statements in open court were sufficient:

I did. I based it basically on credibility. Further, I think my order of findings [is] very, very thorough. . . .

. . . .

I made the findings in open court based upon the credibility, and also the fact that [Laura] acted in good faith, at the very least. Further, there was no evidence of a fraudulent transfer. And clearly, the IRS lien, which would have been superior to . . . [Michael], of course was the impetus for reducing that IRS obligation that could have adhered to not only her but possibly both.

At one point, the court expressed that it "may have been too rash" in rejecting Michael's claim for attorney fees, but the court did not change its mind on that issue.

The court dismissed CI 16-3789 with prejudice subject to fully resolving the amount of attorney fees under § 25-824.

In a second order issued the same day, the court amended the judgment in CI 15-299 so as to tax costs in Laura's favor and against Atelier and Korth jointly and severally in the

amount of $572. The court also stated in the amended order that CI 15-299 was frivolous as against Laura only and that she was entitled to attorney fees under § 25-824.

## 20. Attorney Fees

On February 2, 2018, the court issued two orders, one in CI 15-299 and one in CI 16-3789, determining the amount of and parties responsible for attorney fees under § 25-824. The orders were identical and awarded attorney fees to Laura due to the frivolous nature of the suits. The court again set forth its reasoning that the actions as against Laura were frivolous:

This Court found that the actions against Laura . . . were totally without merit and without a rational argument based upon law and the evidence at trial. Korth and Atelier . . . failed to present evidence to prove their case against Laura . . . . Specifically: (i) there was no testimony from any parties contradicting [Laura's] testimony regarding the purpose of the $450,000.00 loan and security agreement; (ii) there was no evidence that the $450,000.00 was not regarded as a loan; and (iii) there was no evidence showing that [Laura's] bank accounts were used to hide assets from [Michael's] creditors. It is clear that Laura . . . made the loan to Michael . . . in order to protect against an IRS lean [sic] on the marital home. The $450,000.00 loan facilitated a settlement with the IRS and extinguished an outstanding tax obligation in excess of $1.2 million. . . . By acquiring the loan and settling with the IRS, Michael . . . exchanged over $1.2 million of debt to the IRS for $450,000.00 of debt to Laura . . . . This improved his estate by more than $750,000.00, putting Korth and Atelier . . . that much closer to collecting on their respective judgment liens. Clearly, Korth's and [Atelier's] junior lien positions were benefited by [Laura's] loan to Michael . . . . The $450,000.00 loan proceeds went directly from Laura . . . to the IRS. . . . There is no evidence to support the allegation that [Laura's] loan to Michael . . . was fraudulent or collusive.

Furthermore, [Laura's] counsel (David Skalka) notified Korth's counsel (. . . Koukol) as far back as January 27, 2015, that Laura . . . considered the case to be frivolous. . . . Copies of the $450,000.00 loan documentation were included with the notice to . . . Koukol. The security agreement plainly states that the security interest was limited to the $450,000.00 loan which was used to pay the IRS settlement. The Court notes that Korth previously acknowledged receipt of the January 27, 2015, letter from . . . Skalka. Korth offered and this Court received a copy of the letter into evidence on the cross motions for summary judgment. . . . Despite receipt of the loan documentation, Korth and Atelier . . . persisted in their claims against Laura . . . .

Korth and Atelier . . . point to an $8.00 garnishment on a brokerage account during the pendency of this litigation as evidence that an account had been executed upon despite the lien priority dispute. However, during the course of the trial it became abundantly clear that at least Atelier . . . had to have known that Michael . . . did not own said brokerage account. . . . It is also important to note that one of the necessary elements for the claims in CI 16-3789 required Korth and Atelier . . . to establish that a reasonable equivalent value was not given by Laura . . . to Michael . . . . Yet in its July 6, 2015, order on the cross motions for summary judgment in CI 15-299, this Court explicitly found that a reasonable equivalent value had been given. Korth and Atelier . . . maintained their claims against Laura . . . despite this clear signal that they would be unable to establish a necessary element.

The court noted that while it did not grant summary judgment, [t]he fact that the Court deferred to Korth's assertions and did not fully see then what later became apparent at trial—that based on facts which were known to Korth and Atelier . . . there was not a meritorious claim against [Laura]—does not ameliorate the frivolous nature of the

claims and does not preclude this Court from awarding attorney's fees.

The court rejected the notion that Atelier should not share equally in the sanction, finding that Atelier joined the suit with full knowledge and was fully aware of the unreasonableness of the litigation. And the court determined it was appropriate to award sanctions against Koukol and Derr as individuals in order to deter them and other members of the legal profession from future similarly frivolous actions.

The court awarded Laura a judgment of attorney fees in CI 15-299 in the amount of $75,000 and in CI 16-3789 in the amount of $7,000. The court ordered that one-third of the judgments ($27,333) was to be against Korth, one-third ($27,333) against Atelier, and the remaining one-third against Koukol and Derr to be split equally (each liable for $13,667).

### 21. Motion to Alter or Amend and Notices of Appeal

Koukol timely moved to alter or amend the judgment in CI 16-3789 as against him.[3] Koukol's attorney argued that Laura was a necessary party to Korth's action and that therefore, it could not be frivolous as against Laura when it was not frivolous as against Michael. Koukol's attorney also argued that the court's reliance on $1.2 million in superior liens by the IRS was misplaced, because the validity of those liens was contested by Michael in the IRS action. Further, according to Koukol's attorney, the transfer at issue did not include what Michael did with the money, i.e., pay the IRS. How Michael spent the money should not have been relevant to whether the transfer was fraudulent; rather, what was relevant was the fact that Laura loaned Michael the money in exchange for a promissory note that she knew or should have known would not be honored, given Michael's substantial outstanding debt obligations and history of avoiding them. Koukol's attorney also found it unnecessarily convoluted that Laura would loan

---

[3] See Neb. Rev. Stat. § 25-1329 (Reissue 2016).

the settlement money to Michael rather than simply pay the IRS directly, as she was also a defendant in the IRS action and the only person who was at risk in the lawsuit given that Michael was "judgment proof." Koukol's attorney argued that all of this, at a minimum, created issues of fact that rendered the lawsuits not frivolous.

Korth filed a motion styled as a motion to alter or amend in CI 16-3789 more than 10 days after the February 2, 2018, judgment, joining in Koukol's motion.

On June 15, 2018, the court denied the motions to alter or amend. The court did so on the merits and also, in the case of Korth's motion, because it was untimely.

Koukol filed his notice of appeal on July 6, 2018. Atelier, Derr, and Korth filed timely notices of appeal thereafter.

## III. ASSIGNMENTS OF ERROR

Atelier and Korth assign as error, summarized, that the district court erred when it dismissed Korth's fraudulent transfer claim upon finding that Michael did not act with actual intent to hinder, delay, or defraud his creditors and that Laura acted in good faith.

Atelier, Korth, Koukol, and Derr all assign as error, summarized, that the district court erred by (1) finding that the fraudulent transfer claims were frivolous and that frivolous pleading sanctions, including attorney fees, were appropriate and (2) receiving in evidence allegedly altered summaries of Laura's attorney fees, which failed to fulfill the requirements of Neb. Rev. Stat. § 27-1006 (Reissue 2016).

Koukol additionally assigns that the court erred in overruling his motion to alter or amend.

Atelier and Derr additionally assign that the court erred by assessing the same percentage of attorney fee sanctions against them as it did against Korth and Koukol, when Atelier entered the case almost a year after it was commenced and Atelier and Derr were not part of the case when a large number of the fees were incurred.

## IV. STANDARD OF REVIEW

[1,2] An action under the UFTA is equitable in nature, and an appeal of a district court's determination that transfers of assets were in violation of the UFTA is equitable in nature.[4] In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court, provided, however, that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[5]

[3] When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions.[6]

[4] A motion for judgment on the pleadings is properly granted when it appears from the pleadings that only questions of law are presented.[7]

[5] On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.[8]

## V. ANALYSIS

These appeals involve the merits of Atelier's and Korth's challenges under the UFTA to the security agreement. Atelier and Korth do not assign or argue that the district court erred in concluding that a lien priority contest under the UCC was premature, and they no longer assert that either UCC financing statement was a "transfer" under the UFTA. Atelier and

---

[4] *Janice M. Hinrichsen, Inc. v. Messersmith Ventures*, 296 Neb. 712, 895 N.W.2d 683 (2017).

[5] *Id.*

[6] *Maloley v. Central Neb. Pub. Power & Irr. Dist.*, 303 Neb. 743, 931 N.W.2d 139 (2019).

[7] *Foundation One Bank v. Svoboda*, 303 Neb. 624, 931 N.W.2d 431 (2019).

[8] *Chicago Lumber Co. of Omaha v. Selvera*, 282 Neb. 12, 809 N.W.2d 469 (2011).

Korth argue the district court erred in finding that they had failed to prove the security agreement was a fraudulent transfer under § 36-705(a)(1), that Laura had proved a good faith defense, and that their fraudulent transfer actions as against Laura were frivolous. Atelier additionally argues that the court erred in assessing the same amount of sanctions against it as it did against Korth, while Koukol and Derr argue that the court should not have assessed any of the sanctions against them personally. We affirm the district court's judgment dismissing Atelier's and Korth's claims in CI 15-299 and CI 16-3789, but we reverse its determination that the claims were frivolous.

## 1. MERITS OF DISMISSALS OF UFTA CLAIMS

We first address the underlying merits of Atelier's and Korth's fraudulent transfer claims. An action under the UFTA is equitable in nature, and an appeal of a district court's determination that transfers of assets were in violation of the UFTA is equitable in nature.[9] In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court, provided, however, that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

[6] Under the UFTA, a creditor may reach assets transferred by a debtor if the transfer was fraudulent.[10] Atelier and Korth assign that the court erred in failing to find a fraudulent transfer under § 36-705(a)(1). In an action to set aside an actually fraudulent transfer or obligation under § 36-705(a)(1) of the UFTA, it is the plaintiff's burden to prove by clear and convincing evidence that (1) the debtor made a transfer or incurred

---

[9] See *Janice M. Hinrichsen, Inc. v. Messersmith Ventures, supra* note 4.

[10] See §§ 36-705, 36-706, and 36-708.

an obligation, (2) the plaintiff was a creditor of the debtor, and (3) the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.[11]

[7] Our analysis focuses on the first element. "It is fundamental that before there can be a 'fraudulent transfer' under the UFTA, there must be a 'transfer.'"[12] A "[t]ransfer" "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes . . . release . . . and creation of a lien or other encumbrance."[13] An "[a]sset" is defined by the UFTA as "property of a debtor," but the UFTA specifically excludes as an "[a]sset" "property to the extent it is encumbered by a valid lien."[14] "Property" under the UFTA is "anything that may be the subject of ownership."[15]

Section 36-707(1) describes when such a "transfer" of an "asset" occurs. It states that with respect to an "asset" that is not real property, a transfer is made "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under the act that is superior to the interest of the transferee."[16] If applicable law permits the "transfer" to be perfected, and it was not, then it "is deemed made immediately before the commencement of the action."[17] Finally, if applicable law does not permit the "transfer" to be perfected, it is made "when it becomes effective between the debtor and the transferee."[18] In all these circumstances,

---

[11] See, *Janice M. Hinrichsen, Inc. v. Messersmith Ventures, supra* note 4; 55 Causes of Action 2d 467, § 4 (2012).

[12] *Essen v. Gilmore*, 259 Neb. 55, 60, 607 N.W.2d 829, 834 (2000).

[13] § 36-702(12).

[14] § 36-702(2).

[15] § 36-702(10).

[16] § 36-707(1)(ii).

[17] See § 36-707(2).

[18] See § 36-707(3).

however, there is no "transfer" "made until the debtor has acquired rights in the asset transferred."[19] Creditors are not entitled to avoid as fraudulent a conveyance of property to which the debtor had no title at all or no such title as they could have subjected to payment of their claims.[20]

[8] The district court never explicitly determined the threshold question of whether there was a "transfer" of any "asset" by virtue of the security agreement, but that does not preclude this court from doing so under the record presented.[21] In our de novo review, we find under the facts and the theories presented below that Atelier and Korth failed as a matter of law to prove there was any "asset" parted with through the security agreement. They thus failed to prove there was a "transfer" as defined by the UFTA. Atelier and Korth did not argue below or on appeal that the security agreement was an "obligation . . . incurred," and an appellate court reviews a case on the theories pursued by the parties, not on a theory that the parties might have raised.[22]

Throughout the litigation, Atelier and Korth asserted that the security agreement was the "asset" fraudulently transferred, while Laura and Michael insisted that Atelier and Korth identify with more specificity what "assets" Atelier and Korth believed were fraudulently transferred through the agreement. At trial, Murphy testified that he could find no evidence that Michael had transferred any actual property or assets to Laura, and the parties stipulated that they had not successfully seized in execution on their judgments or garnished any rights to payment. Atelier and Korth only ever identified the $8.11 garnished from the brokerage account in the name of Luther Capital as any more particular "asset" at

---

[19] See § 36-707(4).

[20] 37 C.J.S. *Fraudulent Conveyances* § 9 (2017).

[21] See *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018).

[22] See § 36-705(a). Accord *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

issue. The district court concluded the money did not belong to Michael, and Atelier and Korth do not challenge that finding on appeal.

Atelier and Korth concede on appeal that there has yet to be any identifiable property parted with via the security agreement. They continue to assert that the security agreement itself was the "asset."

Successful fraudulent transfer claims have been made in cases involving security agreements, but the courts in those cases have not held that the security agreements themselves were the "property" constituting the "asset" disposed of or parted with.[23] Instead, there were specifically identified "assets" that the creditors were attempting to reach, interests which had been disposed of or parted with through the security agreements.[24] In *Matter of Holloway*,[25] for example, the court referred to the transfer of a security "interest," not of the security agreement. Further, that security interest was *in something*. At issue in that case was the debtor's assignment of a substantial judgment, the funds from which had been deposited into the registry of the court.

In arguing that the security agreement was a "transfer," Atelier and Korth rely on the fact that under § 36-702(12), a "[t]ransfer" "includes . . . creation of a lien or other encumbrance." They fail, though, to suggest an object of the lien or encumbrance effectuated by the security agreement. Liens and encumbrances do not exist independently of the interests they attach to, and this reference to liens or other encumbrances does not modify the express requirement of the UFTA that there be an "asset" before there can be a "transfer."

---

[23] See, *In re Fair Finance Co.*, 834 F.3d 651 (6th Cir. 2016); *Matter of Holloway, supra* note 2; *Webster Industries, Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821 (N.D. Iowa 2004); *In re Afonica*, 174 B.R. 242 (N.D. Ohio 1994).

[24] See *id.*

[25] *Matter of Holloway, supra* note 2, 955 F.2d at 1015.

Intangible interests are not necessarily excluded from the UFTA, of course. The drafters of the model Uniform Fraudulent Transfer Act intended the definition of property to include "real and personal property, whether tangible or intangible, and any interest in property, whether legal or equitable."[26] They envisioned, for instance, that an "'asset'" could include "an unliquidated claim for damages resulting from personal injury or a contingent claim of a surety."[27]

[9] But there are limits to how abstract an interest may be and still constitute "property." Usually, inchoate interests do not satisfy the requirements of a legitimate legal claim constituting "property" and, thus, of an "asset" that the debtor has "acquired rights in"[28]—though few cases explore this realm. The court in *State ex rel. ICA v. Wright*[29] held that the debtor's future wages were not too "speculative or ephemeral" to be "'property'" under Arizona's version of the model Uniform Fraudulent Transfer Act, reasoning that the right to wages was choate while only the amount of the debtor's future income was speculative. In contrast, the court in *In re Morehead* held that there can be no rights to future wages, and thus there is no "transfer," until wages are actually earned.[30] In *AirFlow Houston, Inc. v. Theriot*, the court held that a company logo, name, telephone number, and business records constituting

---

[26] Uniform Fraudulent Transfer Act § 1, comment (10), 7A (part II) U.L.A. 257, 260-61 (2017).

[27] *Id.*, comment (2), 7A (part II) U.L.A. at 259.

[28] See, *Wornick v. Gaffney*, 544 F.3d 486 (2d Cir. 2008); *McGahee v. McGahee*, 204 Ga. 91, 48 S.E.2d 675 (1948); *First Wisconsin Nat. Bank v. Roehling*, 224 Wis. 316, 269 N.W. 677 (1936). See, also, *Allegaert v. Chemical Bank*, 418 F. Supp. 690 (E.D.N.Y. 1976); *Essen v. Gilmore*, 259 Neb. 55, 607 N.W.2d 829 (2000); Robert M. Zinman et al., *Fraudulent Transfers According to Alden, Gross and Borowitz: A Tale of Two Circuits*, 39 Bus. Law. 977 (1984).

[29] *State ex rel. ICA v. Wright*, 202 Ariz. 255, 258, 43 P.3d 203, 206 (Ariz. App. 2002).

[30] *In re Morehead*, 249 F.3d 445, 449 (6th Cir. 2001).

corporate goodwill met the definition of "property" that could constitute "assets" under Texas' version of the model Uniform Fraudulent Transfer Act, because the lower court had found as a matter of fact that such goodwill existed.[31] In contrast, the court in *In re Bob Nicholas Enterprise, Inc.*,[32] rejected the contention that purchase orders and goodwill were property interests capable of being fraudulently transferred, where the creditor had failed to prove the business was reasonably profitable. The court explained that "[a] property interest consists of more than a unilateral expectation or abstract need[;] there must be a legitimate claim of entitlement.[33]

[10,11] We agree with the court in *In re Bob Nicholas Enterprise, Inc.* Whether under the UFTA there is a "'sub-ject of ownership'" constituting "'property'" that can be an ""'[a]sset"'" depends on a legitimate and identifiable claim of entitlement.[34] Further, where the focus of a fraudulent transfer action is a security agreement by the debtor in favor of the alleged transferee, the question is what identifiable and legitimate claim of entitlement the debtor had, which the debtor transferred an interest in via the security agreement. A security agreement by the debtor in favor of an alleged trans-feree is the vehicle for "disposing of or parting with an asset or an interest in an asset."[35] For purposes of the UFTA, a secu-rity agreement by the debtor in favor of an alleged transferee is not the "asset" itself. It could not be otherwise, because whether there is an "asset" under the UFTA requires a spe-cific inquiry into numerous statutory factors, such as whether the "property" was encumbered by a valid lien, whether the "property" was generally exempt under nonbankruptcy

---

[31] *AirFlow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 933 (Tex. App. 1993). See, also, *In re Fair Finance Co., supra* note 23.

[32] *In re Bob Nicholas Enterprise, Inc.*, 358 B.R. 693 (S.D. Tex. 2007).

[33] *Id.* at 701-02.

[34] *Id.* at 701.

[35] See § 36-702(12).

law,[36] and when the debtor acquired rights in the "asset."[37] A blanket security agreement without any reference to particular "property" that the agreement granted the transferee an interest in is not amenable to such inquiries.

[12] Atelier and Korth do not propose anything other than the security agreement as the "property" at issue in CI 15-299 and CI 16-3789. Further, whatever "property" could have been disposed of or parted with by the security agreement, it would have been fully encumbered by "valid lien[s]"[38] when the alleged "transfer" occurred. Only equity in property in excess of the amount of encumbering liens thereon is an "'asset'" reachable by creditors as a fraudulent transfer; encumbered property is not considered part of the debtor's estate.[39]

Though stated in relation to the predecessor of the UFTA, Nebraska's Uniform Fraudulent Conveyance Act,[40] we still find applicable our statement in *Holthaus v. Parsons*[41] that an action to set aside a conveyance cannot be maintained unless the conveyance put beyond the creditor's reach property that would have been subject to the payment of the debt. While "damages" are not an express element of a claim under the UFTA, the various provisions of the UFTA together operate to require that creditors show in a concrete way that they were injured by the transaction they are seeking to set aside. A transfer of property in which the debtor has no equity cannot be the subject of a fraudulent transfer action because the creditors cannot show

---

[36] See § 36-702(2). Accord § 36-709.

[37] See § 36-707(4). Accord § 36-709.

[38] See § 36-702(2)(i).

[39] See *In re McFarland*, 170 B.R. 613, 622 (S.D. Ohio 1994). Accord, *Preferred Funding, Inc. v. Jackson*, 185 Or. App. 693, 61 P.3d 939 (2003); *Rich v. Rich*, 185 W. Va. 148, 405 S.E.2d 858 (1991); *National Loan Investors v. World Properties*, 79 Conn. App. 725, 830 A.2d 1178 (2003).

[40] Neb. Rev. Stat. §§ 36-601 to 36-613 (Reissue 1988) (repealed 1989).

[41] *Holthaus v. Parsons*, 238 Neb. 223, 469 N.W.2d 536 (1991).

they would have received anything by avoiding the transfer and were injured thereby.[42]

[13] A blanket security agreement does not convey an "'asset'" under the UFTA if everything subject to ownership that is described as collateral therein is fully encumbered by other creditors with superior claims at the time of the alleged "'transfer[].'"[43] As the district court repeatedly observed in the context of actual intent, "there was an IRS lien which would have been superior" to other creditors' claims.

Valid liens are defined under the UFTA as liens "effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."[44] It was undisputed that Atelier and Korth never perfected choate liens, i.e., liens that identified with specificity the identity of the lienor, the property subject to the lien, and the amount of the lien.[45] There was no evidence that any other creditor had either. In order to defeat an IRS lien, a creditor must both be prior in time and have a perfected, choate lien.[46] An IRS lien is upon "all property and rights to property"[47] of the debtor, and the moment a prior inchoate interest of the debtor becomes choate, a prior perfected IRS lien in all the taxpayer's property immediately attaches.[48]

The total amount of the security pledged in the security agreement was not more than Michael was obligated to pay under the demand note in the principal amount of $450,000. The IRS action was ultimately settled when the IRS and

---

[42] See 37 C.J.S., *supra* note 20.

[43] See *In re SMTC Mfg. of Texas*, 421 B.R. 251, 295 (W.D. Tex. 2009).

[44] See § 36-702(13). See, also, § 36-702(2)(i).

[45] See *United States v. New Britain*, 347 U.S. 81, 74 S. Ct. 367, 98 L. Ed. 520 (1954).

[46] See *id*.

[47] 26 U.S.C. § 6321 (2012).

[48] See *Citizens Nat. Trust & S. Bank of Los Angeles v. U.S.*, 135 F.2d 527 (9th Cir. 1943).

Michael agreed the lien could be satisfied by payment of $450,000. At that time, the IRS' claims under the lien were in a total amount of $1.2 million. Even if we were to give credence to Atelier and Korth's argument that Michael's estate was not at the time of the security agreement encumbered in the amount of $1.2 million, because Michael "disputed" the IRS' claims, the settlement determined that "valid lien[s]"[49] encumbering Michael's property were at a minimum equal to the value of the property parted with through the security agreement. Accordingly, if any property or interest in property were parted with through the security agreement, such property was fully encumbered and thus excluded as an "asset" under the UFTA.[50]

We acknowledge that the facts of this case may be unique inasmuch as the IRS liens were extinguished shortly after the agreement was made—although we note there are still IRS liens outstanding in the principal amount of $234,064.71. This case is also unique because the security agreement was an indirect part of the settlement transaction. We have not found a case addressing a similar factual scenario under the UFTA, let alone one that addresses within such context whether "valid liens" continue to exist through the doctrine of equitable subrogation.

But, again, we must review this case based on the theories presented below. Consistent with their theory that the security agreement itself was the "asset," Atelier and Korth asserted below that the "transfer" occurred at the time the security agreement was executed. Certainly, at no point did Atelier and Korth argue that the challenged "transfer" occurred after the IRS released its liens. Nor did Atelier and Korth seek to amend their pleadings to identify something other than the abstract security agreement as the "asset," the transfer of which they sought avoidance to the extent necessary to satisfy their

---

[49] See § 36-702(2)(i).

[50] § 36-702(2)(i).

claims.[51] Even if we consider Atelier and Korth's oral argument that under § 36-707(2), there had been a "transfer" immediately before the commencement of the action, they have never identified what interest was sufficiently choate to be "property" "immediately before the commencement of the action," how it was capable under applicable law of perfection, or when Michael had "acquired rights in the asset transferred."[52]

In sum, Atelier and Korth failed to identify and prove there was any "property" at issue in these cases, let alone that any "property" transferred in relation to the security agreement was not excluded under § 36-702(2)(i) as a possible "asset" by virtue of the IRS liens. Atelier and Korth thus failed to prove by clear and convincing evidence that there was a "transfer" under the UFTA, which is a necessary hurdle to any fraudulent transfer claim. Because we conclude that Atelier and Korth failed to prove the threshold element of their fraudulent transfer claims that there was a "transfer," we do not address whether Michael committed actual fraud under § 36-705(a)(1) in making said "transfer" or Laura's good faith defense.

We agree with the district court's ultimate conclusion that Atelier's and Korth's fraudulent transfer actions lacked merit. Atelier and Korth do not assert on appeal that their claim in CI 16-3789 was meaningfully different from their claim in CI 15-299, and we agree with the district court that its judgment on the merits in CI 15-299 rendered judgment as a matter of law appropriate on the fraudulent transfer claim made in CI 16-3789. We affirm the orders of dismissal.

## 2. Merits of Frivolousness Determination

[14] We turn next to the merits of the district court's finding that the claims were frivolous and attorney fees were appropriate under § 25-824(2). On appeal, we will uphold a lower court's decision allowing or disallowing attorney fees for

---

[51] See § 36-709(a).

[52] See § 36-707(4).

frivolous or bad faith litigation in the absence of an abuse of discretion.[53] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[54]

Section 25-824(2) provides that the court shall award reasonable attorney fees and costs against any attorney or party who has brought or defended a civil action that alleged a claim or defense which a court determines is frivolous or made in bad faith. Section 25-824(5) elaborates:

No attorney's fees or costs shall be assessed if a claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in this state or if, after filing suit, a voluntary dismissal is filed as to any claim or action within a reasonable time after the attorney or party filing the dismissal knew or reasonably should have known that he or she would not prevail on such claim or action.

[15-17] Frivolous for the purposes of § 25-824 is defined as being a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position in the lawsuit.[55] It connotes an improper motive or legal position so wholly without merit as to be ridiculous.[56] Any doubt whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.[57]

We conclude that the district court's reasons and rulings on frivolousness were untenable. In finding the actions frivolous, the court reasoned that it should have been discoverable at the

[53] *Chicago Lumber Co. of Omaha v. Selvera, supra* note 8.

[54] *State v. Ettleman*, 303 Neb. 581, 930 N.W.2d 538 (2019).

[55] *Lincoln Lumber Co. v. Fowler*, 248 Neb. 221, 533 N.W.2d 898 (1995).

[56] See *White v. Kohout*, 286 Neb. 700, 839 N.W.2d 252 (2013).

[57] *Sports Courts of Omaha v. Meginnis*, 242 Neb. 768, 497 N.W.2d 38 (1993).

time of the pleadings that there was no "possible factual, legal, a combination of the two" that would have led to any conclusion other than that Laura received the security agreement in good faith "to protect her interest." The court seemed to articulate a similar conclusion with regard to whether Michael had acted with actual intent to hinder, delay, or defraud any creditor or whether he had received a reasonably equivalent value in exchange for the security agreement. In concluding that Atelier and Korth should have known they would be unable to prove Michael acted with actual intent, or prove constructive fraud under a theory that Michael did not receive reasonably equivalent value for the transfer, the court indicated that Atelier and Korth should have known there could be no fraud when there was a superior IRS lien that was the impetus for the loan transaction.

We agree with Atelier, Korth, Koukol, and Derr that claims of actual intent are dependent upon credibility and, as such, would in only the rarest of circumstances be so wholly without merit as to be ridiculous. Likewise, even if we were to impose an objective standard on the good faith defense, an issue we do not decide here, it would have been difficult to predict with certainty what a reasonable person would think regarding the transaction at issue in this case. Further, it is not at all clear that an action can be frivolous under § 25-824 for the reason that a plaintiff should have predicted a defendant would prove an affirmative defense. While there is some logic to the district court's implicit position that as a matter of law, there can be no bad faith or actual fraudulent intent when the position of the debtor's creditors is improved by virtue of the transaction, there is no case law that squares with the facts of this case and directly supports that legal conclusion.

We have concluded that there was no "[a]sset," "[t]ransfer[red]" by the security agreement, primarily because there was no "[p]roperty."[58] But to the extent it could be appropriate

---

[58] See § 36-702. See, also, § 36-707.

to affirm the court's discretionary finding of frivolousness as a right result reached for the wrong reason,[59] we cannot say that it was ridiculous or with improper motive for Atelier and Korth to try the case under the theory that the "property" was the agreement itself. As already illustrated, there is little case law exploring inchoate interests in the context of proving the existence of "property" that was an "asset" "transferred." And we have not found a case where a court has explicitly addressed whether a security agreement, abstracted from any identified "property," is an "asset."

While Atelier's and Korth's legal positions were "perhaps strained and farfetched," that alone does not make them frivolous.[60] Again, all doubts as to whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.[61] This case presented a unique factual scenario implicating questions of law that have never before been addressed by this court. The court abused its discretion in finding the actions frivolous under § 25-824. We find no merit to any suggestion that we should affirm the court's sanctions award under its inherent powers instead.

## VI. CONCLUSION

We reverse the awards of sanctions but otherwise affirm the judgments of dismissal.

Affirmed in part, and in part reversed.

---

[59] See *In re Interest of Jordan B., supra* note 21.

[60] *White v. Kohout, supra* note 56, 286 Neb. at 710, 839 N.W.2d at 261.

[61] *Sports Courts of Omaha v. Meginnis, supra* note 57.